IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

KEROLOS BANOUB,

    Petitioner,

        v.                                            Civil Action No. 3:25cv917

JEFFREY CRAWFORD,

    Respondent.

## MEMORANDUM OPINION

This matter comes before the Court on Petitioner Kerolos Banoub's ("Petitioner")

Amended Petition for a Writ of Habeas Corpus under 28 U.S.C. § 2241 (the "Amended

Petition"). (ECF No. 8.) In the Amended Petition, Mr. Banoub challenges his detention by

Immigration and Customs Enforcement ("ICE"), arguing that his prolonged detention in ICE

custody violates his constitutional right to due process under the Fifth Amendment to the United

States Constitution and the Immigration and Nationality Act.[1] (ECF No. 8 ¶¶ 15–18.)[2]

---

[1] In the Amended Petition, Mr. Banoub argues that his detention violates 8 U.S.C. § 1226. (ECF No. 8, at 1.) But § 1226 governs the arrest and detention of aliens *prior* to a final order of removal. *See* 8 U.S.C. § 1226(a) (providing that "[o]n a warrant issued by the Attorney General, an alien may be arrested and detained *pending a decision on whether the alien is to be removed* from the United States") (emphasis added).

In contrast, Mr. Banoub is subject to a final order of removal, (*see* ECF No. 10-1, at 6–10), meaning his detention is governed by 8 U.S.C. § 1231, not § 1226. *See Crespin v. Evans*, 256 F. Supp. 3d 641, 646 (E.D. Va. 2017) (explaining that 8 U.S.C. § 1226 "governs the procedures for detaining an alien before a removal decision" while 8 U.S.C. § 1231 "governs the detention of aliens following a removal decision"). At the evidentiary hearing, the parties correctly agreed that Mr. Banoub is detained under § 1231. The Court thus considers Mr. Banoub's allegations under the INA as a challenge to his detention under 8 U.S.C. § 1231.

[2] Mr. Banoub also seeks attorney's fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412. (ECF No. 8 ¶ 19.) Mr. Banoub has no cognizable claim for attorney's fees

On November 17, 2025, Mr. Banoub filed the Amended Petition. (ECF No. 8.) Respondent responded, (ECF No. 10), and Mr. Banoub replied, (ECF No. 12). On December 22, 2025, the Court held an evidentiary hearing on Mr. Banoub's Amended Petition. (ECF No. 19.) This matter is ripe for disposition. For the reasons articulated below, the Court will grant the Amended Petition and order Mr. Banoub released. (ECF No. 8.)

## I. Factual and Procedural Background

### A.    Factual Findings

#### 1.    Mr. Banoub Arrives in the United States and is Subject to Initial Removal Proceedings

None of the material facts are in dispute. Mr. Banoub is a nineteen-year-old citizen of Egypt. (ECF No. 19-3 ¶ 1.) In 2023, Petitioner's father fled Egypt "due to harm suffered there." (ECF No. 8 ¶ 13.) Petitioner later fled Egypt after facing persecution and threats following his father's escape. (ECF No. 8 ¶ 13.)

Mr. Banoub "entered the United States without inspection on or about October 15, 2024, near the southern border." (ECF No. 8 ¶ 8.) Customs and Border Protection ("CBP") encountered Mr. Banoub near Jamul, California. (ECF No. 10-1 ¶ 6.) CBP determined that Mr. Banoub "entered the United States near Otay Mesa, California, from Mexico, without being admitted or paroled by an immigration officer." (ECF No. 10-1 ¶ 6.) CBP "therefore

---

because a habeas proceeding is not a "civil action" under the EAJA. *Obando-Segura v. Garland*, 999 F.3d 190, 195–97 (4th Cir. 2021); *Quispe v. Crawford*, No. 1:25-cv-1471 (AJT), 2025 WL 2783799, at *3–4 (E.D. Va. Sept. 29, 2025).

determined that [Mr. Banoub] was subject to detention pursuant to 8 U.S.C. § 1225(b)(2)(A)"[3]

and "transported [Mr. Banoub] to the San Diego detention office for further processing." (ECF

No. 10-1 ¶ 6.) Mr. Banoub has been detained by ICE since October 15, 2024. (ECF No. 8 ¶ 6.)

On December 11, 2024, Mr. Banoub was issued a Notice to Appear ("NTA"),[4] charging

him with being inadmissible to the United States as an alien present in the United States without

being admitted or paroled and an applicant for admission to the United States without possession

of a valid entry document in violation of 8 U.S.C. §§ 1182(a)(6)(A)(i) and (a)(7)(A)(i)(I). (ECF

No. 10-1 ¶ 7.) Mr. Banoub attended a Master Calendar Hearing before an Immigration Judge on

January 15, 2025. (ECF No. 10-1 ¶ 8.) The Immigration Judge "sustained the charges of

removability and designated Egypt as the country of removal." (ECF No. 10-1 ¶ 8.)

On January 30, 2025, Mr. Banoub attended a bond hearing before an Immigration Judge.

(ECF No. 10-1 ¶ 10.) The Immigration Judge denied Mr. Banoub bond pursuant to the United

States Attorney General's decision in *Matter of M-S*, 27 I&N Dec. 509 (A.G. 2019).[5] (ECF No.

---

[3] 8 U.S.C. § 1225(b)(2)(A) provides:

> [With some limitations,] in the case of an alien who is an applicant for admission,
> if the examining immigration officer determines that an alien seeking admission is
> not clearly and beyond a doubt entitled to be admitted, the alien shall be detained
> for a [removal] proceeding under [8 U.S.C. § 1229a].

8 U.S.C. § 1225(b)(2)(A).

[4] A Notice to Appear is a "'[c]harging document' that 'initiates a proceeding before an Immigration Judge.'" *Hasan v. Crawford*, —F. Supp. 3d—, 2025 WL 2682255, at *1 n.3 (E.D. Va. 2025) (quoting 8 C.F.R. § 1003.13).

[5] In *Matter of M-S*, the Attorney General issued an interim opinion determining that where an alien is moved from expedited removal proceedings to full removal proceedings after establishing a credible fear of persecution or torture, that alien is ineligible for release on bond but may be granted parole at the Department of Homeland Security's discretion. *Matter of M-S*, 27 I&N Dec. 509 (A.G. 2019).

10-1 ¶ 10.)

On February 26, 2025, Mr. Banoub "filed a Form I-589, Application for Asylum and for Withholding of Removal," seeking withholding of removal under the INA and the Convention Against Torture ("CAT"). (ECF No. 8 ¶ 8; ECF No. 10-1 ¶ 11.) On April 23, 2025, Mr. Banoub "appeared with counsel for an individual hearing on the merits of his application for relief." (ECF No. 10-1 ¶ 12.) The Immigration Judge denied Petitioner's application for asylum and ordered Mr. Banoub removed from the United States. (ECF No. 8 ¶ 9; ECF No. 10-1 ¶ 12.) However, the Immigration Judge found that Mr. Banoub would face persecution if he returned to Egypt because of his "Coptic Christian Faith and family ties to his father's political activism." (ECF No. 8 ¶ 9.) On these grounds, the Immigration Judge granted Mr. Banoub's application for withholding of removal to Egypt under 8 U.S.C. § 1231(b)(3)(A).[6] (ECF No. 10-1 ¶ 12; ECF No. 10-1, at 6.) The same day, the Department of Homeland Security ("DHS") and Mr. Banoub waived their rights to appeal the Immigration Judge's decision, and Petitioner's removal order became final on April 23, 2025. (ECF No. 10-1 ¶ 12.) Mr. Banoub remained in custody after the final order of removal was entered.

---

[6] 8 U.S.C. § 1231(b)(3)(A) provides, in relevant part:

(3) Restriction on removal to a country where alien's life or freedom would be threatened

(A) In general. Notwithstanding paragraphs (1) and (2), the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion.

8 U.S.C. § 1231(b)(3)(A).

On July 22, 2025, ICE completed Mr. Banoub's "90-day Post Order Custody Review"[7] and "determined that Petitioner would remain detained pending ongoing efforts for removal to a third country." (ECF No. 10-1 ¶ 15.) "This determination was based on Petitioner's flight risk as a recent border entrant with limited physical presence in the United States." (ECF No. 10-1 ¶ 15.)

On October 16, 2025, DHS completed Mr. Banoub's "180-day Post Custody Order Review" and again determined that Petitioner would remain detained. (ECF No. 10-1 ¶ 16.) This determination "was based on [Mr. Banoub] still not meeting the criteria for release set forth in 8 C.F.R. § 241.4(e)[8] and ICE actively working with the United States Department of State on

_____

[7] DHS regulations permit detainees to request reconsideration of their detention every three months "based on a proper showing of material change in circumstances." *See* 8 C.F.R. § 241.4(k)(2)(iii); *see Castaneda v. Perry*, 95 F.4th 750, 761–62 (4th Cir. 2024).

[8] 8 C.F.R. § 241.4(e) sets forth the criteria for release for aliens detained following entry of a removal order. In relevant part, it provides:

> Before making any recommendation or decision to release a detainee, a majority of the Review Panel members, or the Director of the [Headquarters Post-Order Detention Unit] in the case of a record review, must conclude that:
>
>> (1) Travel documents for the alien are not available or, in the opinion of the Service, immediate removal, while proper, is otherwise not practicable or not in the public interest;
>>
>> (2) The detainee is presently a non-violent person;
>>
>> (3) The detainee is likely to remain nonviolent if released;
>>
>> (4) The detainee is not likely to pose a threat to the community following release;
>>
>> (5) The detainee is not likely to violate the conditions of release; and
>>
>> (6) The detainee does not pose a significant flight risk if released.

8 C.F.R. § 241.4(e).

[Mr. Banoub's] removal to a third country." (ECF No. 10-1 ¶ 16.)

### 2. ICE Continues to Search for, and Fails to Find, a Third Country to Which it Could Remove Mr. Banoub

Because of the Immigration Judge's order withholding removal, Mr. Banoub remained detained for months while DHS sought to remove him to a third country other than Egypt. Respondent contends that DHS is "actively working" on Petitioner's removal to a third country. (ECF No. 10-1 ¶ 17.) Respondent alleges he has attempted to effectuate Mr. Banoub's removal from the United States through two mechanisms: first, via I-241 requests to Mexico, Libya, and Sudan and second, via a Third Country Removal Agreement negotiated through the State Department.

Although the federal ICE agent responsible for Africa testified about at least three methods of third country removal, she offered specific knowledge as to only one. By way of background, Janese Mull, ICE Unit Chief of the Removal Management Division for Africa, testified to the three levels she interacted with when her duties involved third country removals. First, she described ICE Field Offices that, among other duties, sent out what are called I-241 requests to individual countries asking if they might accept an alien from a country other than their own. Unit Chief Mull, explained at ICE headquarters, does not directly oversee this process. Second, her office, ICE headquarters, helps effectuate third country removals with the Department of State. ICE creates a list of aliens who could meet the nomination criteria for removal to a third country and sends it to a country. Third, the Department of State then engages in sensitive and diplomatic negotiations with a country—no part of which can be or is shared with DHS—to determine whether a country will accept an alien or aliens and whether the country can provide diplomatic assurances that aliens removed from the United States will not be persecuted or tortured.

6

        **i.**      **ICE Fails to Follow Up on its I-241 Requests to Remove Mr. Banoub**

On July 8, 2025, "DHS sent form I-241 Requests for Travel Documents to Mexico, Libya, and Sudan." (ECF No. 10-1 ¶ 14.) At the evidentiary hearing on December 22, 2025, Unit Chief Mull testified that, to her knowledge, ICE is no longer pursuing Mr. Banoub's removal to Mexico, Libya, or Sudan. These I-241 forms were sent by the ICE Field Office. Unit Chief Mull does not directly supervise that process. Unit Chief Mull stated either Mexico, Libya, or Sudan (she could not recall which) responded that it would not accept Mr. Banoub. She also testified that she did not believe that ICE had followed up on the remaining requests to the two other countries, and that although they remain "pending," there is nothing to indicate that ICE is pursuing removal of Mr. Banoub to Mexico, Libya, or Sudan.

Unit Chief Mull also explained that in July 2025, ICE "headquarters" instructed its Field Offices stop utilizing I-241 requests. Instead, in an effort to streamline third country removals, ICE headquarters now works with the Department of State to arrange Third Country Agreements. If a third country did not respond to a prior I-241 request, the request remains pending, but ICE headquarters (where Unit Chief Mull serves) will not follow up with that third country. According to Unit Chief Mull, ICE's efforts to remove Mr. Banoub now focus on the Department of State's arrangement of Third Country Agreements. ICE headquarters effectuates that process.

        **ii.**     **ICE Provides Unreliable Evidence Regarding Mr. Banoub's Removal Through Third Country Removal Agreements**

In July 2025, ICE began to coordinate with the Department of State to arrange Third Country Removal Agreements to effectuate the removal of aliens to third countries. As Unit Chief Mull, who is familiar with Mr. Banoub's case, explained during the evidentiary hearing,

7

coordinating a Third Country Removal Agreement includes several steps. Once the Third Country Removal Agreement is finalized, ICE follows procedures set out in Guidance promulgated by DHS in March 2025 (the "March Guidance") to effectuate the alien's removal to the third country. Unit Chief Mull's testimony suggests that ICE's current third country removal process includes roughly eight steps:

*First*, the Department of State negotiates a removal agreement with a third country. This negotiation starts by setting "nomination criteria" with the third country to determine the kinds of individuals the third country is willing to accept. Once the nomination criteria are established, the Department of State notifies ICE.

*Second*, ICE creates a list of aliens who meet the nomination criteria for removal to the third country.

*Third*, ICE's list of nominated aliens is sent to the third country for review. The third country may accept all, some, or none of the nominated aliens on the list. Unit Chief Mull testified that the timeline for the review process "varies," and that there is no set amount of time within which a third country must complete its review of potential aliens to accept.

*Fourth*, if a third country accepts an alien, ICE is notified and proceeds with removal of that alien as set out in the March Guidance. (*See* ECF No. 18-1.)

*Fifth*, in accordance with the March Guidance, DHS determines whether the third country "has provided diplomatic assurances that aliens removed from the United States will not be persecuted or tortured." (ECF No. 18-1, at 1.) "If the United States has received such assurances, and if the Department of State believes those assurances to be credible, the alien may be removed without the need for further procedures." (ECF No. 18-1, at 1–2.) But if "the United States has not received those assurances, or the Department of State does not believe

8

them to be credible," DHS proceeds to step six.  (ECF No. 18-1, at 2.)

   *Sixth*, DHS will "inform the alien of removal to that country."  (ECF No. 18-1, at 2.)
When doing so, "[i]mmigration officers will not affirmatively ask whether the alien is afraid of
being removed to that country."[9]  If the alien "affirmatively states a fear of removal," DHS will
refer the alien to U.S. Citizenship and Immigration Services ("USCIS") for screening for
eligibility for protection from removal under the INA and CAT.  (ECF No. 18-1, at 2.)

   *Seventh*, where an alien affirmatively states a fear of persecution or torture, USCIS "will
generally screen the alien within 24 hours of referral from the immigration officer."  (ECF
No. 18-1, at 2.)  An asylum officer at USCIS "will determine whether the alien would more
likely than not be persecuted on a statutorily protected ground or tortured in the country of
removal."[10]  (ECF No. 18-1, at 2.)  Unit Chief Mull testified that she could not identify the
specific timeframe in which this determination has to be made, but she supposed it occurred
expeditiously.

   *Eighth*, "[i]f USCIS determines that the alien has met this standard," USCIS refers the
matter to Immigration Court for proceedings to determine the alien's eligibility for withholding

___

   [9] The March Guidance explains that it will not affirmatively ask about the alien's fear of removal because "such questioning may be suggestive" and "lead[] to false claims rendering the immigration system as a whole less efficient."  (ECF No. 18-1, at 2.)

   [10] Given that Unit Chief Mull does not interact with the USCIS asylum officers who conduct the screening at this stage, Unit Chief Mull could offer little, if any, detail about the procedure used, although she appeared to think the alien could submit something during the process.  But she did not know whether the alien could make a written, or other submission. Unit Chief Mull did, however, confirm that if the USCIS asylum officer concludes the expression of fear was unwarranted by making a negative finding, the only notice the alien receives of that decision is that, at some point, he or she will be removed to the third country within twenty-four hours.

of removal under the INA and CAT for the country of removal. (ECF No. 18-1, at 1.) "Alternatively, ICE may choose to designate another country for removal." (ECF No. 18-1, at 2.)

Unit Chief Mull testified that Mr. Banoub's case is at the third step: on December 18, 2025, Mr. Banoub's case was "nominated" for third country removal. Unit Chief Mull was not authorized to share the name of the third country during the hearing, but she confirmed that the country was not Mexico, Libya, or Sudan. She also verified that the country had not previously accepted third country removals from the United States. Unit Chief Mull then testified that because the third country has no history of Third Country Removal Agreements with the United States, she could not estimate the unnamed country's timeline to accept Mr. Banoub.

Unit Chief Mull concluded that the likelihood of Mr. Banoub's removal is "significant." But she also testified that she is not aware of *any* Egyptian citizens who have been removed to a third country pursuant to a Third Country Removal Agreement *this year*, including any in a similar posture to Mr. Banoub: an Egyptian citizen of Coptic Christian faith and with family ties to a person who fled Egypt after engaging in unwelcome political activities there.

### 3.    Mr. Banoub Maintains Strong Ties to the United States

Mr. Banoub has "strong ties" to the United States. (ECF No. 19-3 ¶ 6.) Mr. Banoub's father, Emad Banoub, lives and works in Manassas, Virginia. (ECF No. 8 ¶ 10; ECF No. 19-3 ¶ 6.) His father is committed to providing Mr. Banoub with housing, basic living needs, and transportation. (ECF No. 19-3 ¶ 6.) His father's employer, Dominion Tire Company, "has extended a conditional employment offer to Mr. Banoub upon release and work authorization." (ECF No. 8 ¶ 12.)

Mr. Banoub's aunt, Gowhara Fawzy Banoub, is a United States Citizen.  (ECF No. 8 ¶ 11.)  She lives in Nashville, Tennessee and is also prepared to provide financial support, food, clothes, and transportation to Mr. Banoub if released.  (ECF No. 8 ¶ 11.)

Mr. Banoub "has no criminal history, in the United States or abroad."  (ECF No. 19-3 ¶ 6.)

### B.    **Procedural Background**

On November 3, 2025, Mr. Banoub filed a petition for a writ of habeas corpus under 28 U.S.C. § 2241.  (ECF No. 1.)  On November 5, 2025, the Court ordered Mr. Banoub to file, within ten days, an amended petition in compliance with Rule 2(c)(5) of the Rules Governing Section 2254 Cases.[11]  (ECF No. 4.)  On November 7, 2025, Mr. Banoub's counsel filed an amended petition that still did not comply with habeas Rule 2.  (ECF No. 6.)  On November 12, 2025, this Court again ordered Petitioner to file, within five days, an amended petition that complied with Rule 2.  (ECF No. 7.)  On November 17, 2025, Mr. Banoub filed the instant Amended Petition, which complies with habeas Rule 2.[12]  (ECF No. 8.)

Also on November 17, 2025, this Court ordered Respondent to file a response indicating

---

[11] Rule 1(b) of the Rules Governing § 2254 Cases permits this Court to apply the Rules Governing § 2254 Cases to petitions under 28 U.S.C. § 2241.  Rule 1(b), Rules Governing § 2254 Cases; *see Aguayo v. Harvey*, 476 F.3d 971, 976 (D.C. Cir. 2007).

[12] In the Amended Petition, Mr. Banoub argues that his continued detention "risks becoming indefinite[] in violation of due process principles outlined in *Zadvydas v. Davis*, 533 U.S. 678 (2001), and related case law applying to prolonged detention under INA § 1226(a)." (ECF No. 8, at 4.)  But the "due process principles" outlined in *Zadvydas* govern detention only under § 1231, not § 1226.  And as the Court explained, and the parties agreed at the hearing, because Mr. Banoub is subject to a final order of removal, his detention is governed by § 1231, not § 1226(a).  *See* Note 1 *infra*.

The Court therefore considers Mr. Banoub's Amended Petition as advancing a claim under *Zadvydas* and § 1231, *not* § 1226(a).  To the extent Mr. Banoub argues that he is entitled to a bond hearing under § 1226(a) and requests such a hearing, (*see* ECF No. 8, at 1; ECF No.

whether the factual and legal issues presented in the instant Amended Petition materially differ from those presented in *Duarte Escobar v. Perry, et al.*, 3:25-cv-758 (E.D. Va. 2025). (ECF No. 9.)

On November 21, 2025, Respondent timely filed his response. (ECF No. 10.) In the response, Respondent explains that the "factual and legal issues in the present case *are* materially different from those in *Duarte Escobar*." (ECF No. 10, at 1 (emphasis in original).) Unlike in *Duarte Escobar*, which addressed whether an alien present in the United States is properly subject to mandatory detention during the pendency of his removal proceedings, Mr. Banoub is "subject to a final order of removal." (ECF No. 10, at 1.) Respondent characterizes the instant Amended Petition as advancing a claim pursuant to *Zadvydas v. Davis*, 533 U.S. 678 (2001), an "entirely different claim that the claim presented in *Duarte Escobar*." (ECF No. 10, at 2.) Respondent argues that the Amended Petition should be denied. (ECF No. 10, at 2.)

On November 24, 2025, this Court ordered Mr. Banoub to file, by December 1, 2025, a reply to Respondent's response. (ECF No. 11.) On November 26, 2025, Mr. Banoub filed his reply. (ECF No. 12.) On December 19, 2025, one business day prior to the hearing, Respondent filed a memorandum. (ECF No. 18.) In Respondent's pre-hearing memorandum, Respondent stated that he would "not contend at the hearing that there is a significant likelihood of removal to Mexico, Libya, or Sudan, in the reasonably foreseeable future." (ECF No. 18, at 2.) Rather, Respondent indicated that the "focus of [his] presentation at the hearing" would be that "there is a 'significant likelihood of [Petitioner's] removal [from the United States] in the reasonably foreseeable future.'" (ECF No. 18, at 2.)

---

12, at 4–5), the Court denies the request. *See Castaneda v. Perry*, 95 F.4th 750, 753 n.2 (4th Cir. 2024) ("Under § 1231, '[an] alien is not entitled to a bond hearing.'" (quoting *Johnson v. Guzman Chavez*, 594 U.S. 523, 526 (2021)).

On December 22, 2025, this Court held an evidentiary hearing on the Amended Petition. (ECF No. 19.)

## II.  Standard of Review

28 U.S.C. § 2241(a) provides that "[w]rits of habeas corpus may be granted by the Supreme Court, any justice thereof, the district courts and any circuit judge within their respective jurisdictions." *Id.*  "A federal court may grant habeas relief only on the ground that the petitioner is in custody in violation of the Constitution or laws or treaties of the United States." *Torrence v. Lewis*, 60 F.4th 209, 213 (4th Cir. 2023) (internal citations and brackets omitted); *see also Zadvydas v. Davis*, 533 U.S. 678, 687 (2001).  After receiving the petition and any response thereto, "[t]he court shall summarily hear and determine the facts, and dispose of the matter as law and justice require."  28 U.S.C. § 2243.

## III.  Analysis

The central issue before the Court is whether Mr. Banoub's removal from the United States is likely to occur in the reasonably foreseeable future.  *See Zadvydas v. Davis*, 533 U.S. 678 (2001).  According to Respondent, ICE's ongoing efforts to remove Mr. Banoub to an unnamed third country—efforts that ICE has failed to describe in any detail—sufficiently establish that Mr. Banoub's removal is reasonably foreseeable.  Mr. Banoub, in contrast, contends that ICE has failed to take sufficiently concrete steps to establish his reasonably foreseeable removal.

For the reasons articulated below, the Court concludes that Mr. Banoub has shown that his removal from the United States is not reasonably foreseeable and that Respondent has not

rebutted this showing.[13]

**A.    Mr. Banoub's Detention is Unlawful Under 8 U.S.C. § 1231 and _Zadvydas_ Because His Removal is Not Reasonably Foreseeable**

**1.    Legal Standard:  Post-Removal Order Detention Under 8 U.S.C. § 1231 and _Zadvydas_**

8 U.S.C. § 1231 governs the detention and removal of aliens subject to final orders of

removal.[14]  Under § 1231, upon the issuance of a final order of removal to an alien, the alien

---

[13] As a threshold matter, although the parties do not argue otherwise, the Court confirms that it has jurisdiction over Mr. Banoub's Amended Petition. _See Zadvydas_, 533 U.S. at 687–88 (noting that when a petitioner challenges "the extent of the Attorney General's authority under the post-removal-period detention statute," § 2241 habeas proceedings are available for "statutory and constitutional challenges" to such detention); _see also Zavvar v. Scott_, No. 25-2104-TDC, 2025 WL 2592543, at *3 (D. Md. Sept. 8, 2025) (same).

The Court adds that its jurisdiction over the Amended Petition is not impacted by _D.V.D. v. U.S. Dep't of Homeland Sec._, 778 F. Supp. 3d 355 (D. Mass. 2025).  In _D.V.D._, a district court granted a preliminary injunction relating to a certified class of aliens presently subject to a final order of removal and whom DHS "has deported or will deport on or after February 18, 2025, to a country (a) not previously designated as the country or alternative country of removal, and (b) not identified in writing in the prior proceedings as a country to which the individual would be removed." _Id._ at 378, 393.  The preliminary injunction required certain procedural steps to occur before the removal of a class member to a third country. _See id._ at 392–93.

_D.V.D._ is inapposite.  The relief Mr. Banoub seeks—release from detention pending removal—is not relief sought on behalf of the class in _D.V.D._  The Court will not dismiss or stay the Amended Petition as a result of _D.V.D. See Zavvar_, 2025 WL 2592543, at *3.  To assure a full record, the Court adds that Respondent correctly notes that, on July 3, 2025, the Supreme Court stayed the injunction in full. _DHS v. D.V.D._, — S. Ct. —, 2025 WL 1832186, at *1 (U.S. July 3, 2025).  (ECF No. 9–10 n.2.)

[14] 8 U.S.C. § 1231 provides, in pertinent part:

(a) Detention, release, and removal of aliens ordered removed

(1) Removal period

(A) In general

Except as otherwise provided in this section, when an alien is ordered removed, the Attorney General shall remove the alien from the United

shall be removed "within a period of 90 days."[15]  8 U.S.C. § 1231(a)(1)(A).  The alien "*shall*" be detained during the removal period.  *Id.*

An alien not removed during the removal period may be released or detained.  Under 8 U.S.C. § 1231(a)(3), aliens who do not leave the United States or are not removed during the removal period "*shall* be subject to supervision" pending their removal.  8 U.S.C. § 1231(a)(3) (emphasis added).  But § 1231(a)(6) provides that certain noncitizens, including those "determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period."  8 U.S.C. § 1231(a)(6).  That

---

> States within a period of 90 days (in this section referred to as the "removal period").

>             * * *

> (2) Detention

>> (A) In general

>>> During the removal period, the Attorney General shall detain the alien.

8 U.S.C. § 1231(a)(1)–(2).

[15] The removal period begins to run from the latest of three dates:

> (i) The date the order of removal becomes administratively final;

> (ii) If the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court's final order; or,

> (iii)  If the alien is detained or confined (except under an immigration process), the date the alien is released from detention or confinement.

8 U.S.C. § 1231(a)(1)(B).

Here, the parties agree that the removal period began on April 23, 2025, after the Immigration Judge ordered Mr. Banoub removed and Mr. Banoub and the United States waived their rights to appeal.  (ECF No. 10, at 9; *see* ECF No. 12, at 2.)

is, § 1231(a)(6) permits the continued detention of an alien after the removal period.

Section 1231 "does not specify a time limit on how long DHS may detain an alien in the post-removal period." *Castaneda v. Perry*, 95 F.4th 750, 755–56 (4th Cir. 2024). But the United States Supreme Court addressed this issue in *Zadvydas v. Davis*, 533 U.S. 678 (2001). In *Zadvydas*, the Supreme Court considered whether § 1231(a)(6) authorizes the indefinite detention of an alien subject to a removal order, or whether the statute permits detention only for a period reasonably necessary to secure the alien's removal. *Zadvydas*, 533 U.S. at 692. Recognizing the "serious constitutional problem arising out of a statute that . . . permits an indefinite, perhaps permanent, deprivation of human liberty," *Zadvydas*, 533 at 692, the *Zadvydas* Court "construe[d] [§ 1231] to contain an implicit 'reasonable time' limitation.'" *Castaneda*, 95 F.4th at 756 (quoting *Zadvydas*, 533 U.S. at 682). This period, the Supreme Court determined, is presumptively six months. *Id.* (citing *Zadvydas*, 533 U.S. at 701).

The six-month presumption "does not mean that every alien not removed must be released after six months." *Zadvydas*, 533 U.S. at 701. But if an alien is detained beyond six months, the reasonable presumption no longer exists. At that point, "if 'the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing' or release the alien." *Castaneda*, 95 F.4th at 756 (quoting *Zadvydas*, 533 U.S. at 701); *see also Menghua Wan v. Crawford*, No. 1:13-cv-1473 (JCC), 2014 WL 970180, at *3 (E.D. Va. Mar. 12, 2014) (explaining the burden-shifting test established in *Zadvydas* to assess the constitutionality of detention following the presumptively reasonable six-month period).

16

**2.    Mr. Banoub Has Been Detained for More than Six Months Meaning That His Detention Therefore Exceeds the Presumptively Reasonable Six-Month Period**

It is undisputed that Mr. Banoub is detained beyond the presumptively reasonable six-month period established in *Zadvydas*. (*See* ECF No. 10, at 10 ("Respondent[] concede[s] that Petitioner meets the first requirement and has been detained for longer than the presumptively constitutional six-month period.").) The parties agree that Mr. Banoub's removal period began on April 23, 2025, when the Immigration Judge ordered Mr. Banoub removed from the United States and both parties waived the right to appeal. (*See* ECF No. 10-1, at 6–9.)

Because nearly eight months have elapsed since April 23, 2025, Mr. Banoub's detention exceeds the presumptively reasonable six-month period under *Zadvydas*. The Court next determines whether Mr. Banoub has established that there exists no significant likelihood of his removal in the reasonably foreseeable future. *Castaneda*, 95 F.4th at 756.

**3.    Mr. Banoub has Shown that his Removal is not Reasonably Foreseeable**

Mr. Banoub argues that there is no significant likelihood of his removal in the reasonably foreseeable future. (ECF No. 8 ¶ 14.) The Court agrees.

First, Mr. Banoub has been granted withholding of removal to Egypt, (ECF No. 8 ¶ 14; ECF No. 10-1, at 6), the only country to which Mr. Banoub has a claim to citizenship or legal immigration status, (ECF No. 19-3 ¶ 5). Without lifting the withholding of removal, Mr. Banoub cannot be removed to Egypt. *See Zavvar v. Scott*, No. 25-2014, 2025 WL 2592543, at *7 (D. Md. Sept. 8, 2025). As other courts have found, "'[a] grant of withholding of removal substantially increases the difficulty of removing an individual." *Zavvar*, 2025 WL 2592543, at *7 (quotation omitted); *Munoz-Saucedo v. Pittman*, 789 F. Supp. 3d 387, 399 (D.N.J. 2025) (same). Indeed, unlike the petitioners in *Zadvydas* who were subject to final orders of removal

but did *not* have pending legal bars to removal, *see Zadvydas*, 533 U.S. at 684, Mr. Banoub has been granted withholding of removal to Egypt, the only country outside of the United States to which he claims any real ties, (ECF No. 19-3 ¶ 5). Thus, that Petitioner cannot be removed to Egypt presents strong evidence that his removal is unlikely to occur in the reasonably foreseeable future. *Cf. Piao v. Lyons*, No. 1:25-cv-1725 (AJT), 2025 WL 3046783, at *3 (E.D. Va. Oct. 31, 2025) (finding that removal was reasonably foreseeable where "[r]espondents . . . represented that [p]etitioner's travel documents to China," his home country, "were approved" and that issuance of the documents would "permit [p]etitioner to board a commercial flight to China"); *Clarke v. Kuplinski*, 184 F. Supp. 3d 255, 259–61 (E.D. Va. 2016) (finding that removal was reasonably foreseeable where the United States worked closely and diligently with Jamaican officials to effectuate petitioner's removal to his home country).

Mr. Banoub also correctly contends that "there is no indication of viable third-country removal options." (ECF No. 8 ¶ 14.) In briefing, Respondent initially argued that Mr. Banoub's removal was reasonably foreseeable because DHS sent three I-241 to Mexico, Libya, and Sudan in July 2025 requesting Mr. Banoub's removal to one of those countries. (ECF No. 10-1 ¶ 14.) But just two business days before the evidentiary hearing on Mr. Banoub's Amended Petition, and after five months passed without any updates from Respondent as to whether these countries had responded, agreed to accept Mr. Banoub, or started any part of the removal process, Respondent abandoned his argument that Mr. Banoub's removal to Mexico, Libya, or Sudan was reasonably foreseeable. (ECF No. 18, at 2.)

Indeed, at the hearing, Unit Chief Mull testified that (1) at least Mexico, Libya, or Sudan had refused to accept Mr. Banoub, (2) ICE did not follow up with the remaining two countries, and (3) she was not aware of any evidence that ICE intended to pursue Mr. Banoub's removal to

18

Mexico, Libya, or Sudan. Clearly, despite Respondent's contrary representations just one month ago, Mr. Banoub is *not* likely to be removed to Mexico, Libya, or Sudan in the reasonably foreseeable future. *See Zavvar*, 2025 WL 2592543, at *7 (finding that third countries' lack of response to I-241 requests for "more than two months" weighed in favor of finding that removal was not reasonably foreseeable).

Although Unit Chief Mull testified that on December 18, 2025, Mr. Banoub was nominated for review by a new third country, removal to this third country appears similarly unlikely for at least four reasons. First, as Unit Chief Mull testified, it is not clear how long the third country review process will take. Importantly, she confirmed that, appropriately, she could not know details about the sensitive diplomatic negotiations that occurred above her level. Unit Chief Mull was unable to provide even an approximate timeframe and explained only that the timeline for the review process "varies." *See Cruz Medina v. Noem*, 794 F. Supp. 3d 365, 379 (D. Md. 2025) ("[O]f particular relevance under *Zadvydas*, [petitioner] has pointed to the noncommittal nature of the representations that the government has made regarding the possibility of removal to El Salvador: that it 'intends' to remove him to El Salvador, and that his case is 'under current review by El Salvador for the issuance of a travel document.'").

But even if Unit Chief Mull had provided an estimate, she testified that the unnamed third country in question has not previously participated in a Third Country Agreement with the United States. Without any evidence about timeframes for the review process in general—and particularly as to the country at issue—the Court is not persuaded that Mr. Banoub's removal is reasonably foreseeable to a third country with *no* history of third country removals from the United States.

Second, and similarly, because the unnamed third country to which Mr. Banoub was

19

nominated has never entered into a Third Country Agreement with the United States, no evidence that the country will accept Egyptian citizens exists. As Mr. Banoub argued in his briefing, Mexico, Libya, and Sudan have no history of accepting Egyptians. (ECF No. 12, at 3.) The record provides no reason for the Court to assume otherwise about the unnamed third country.

Third, and relatedly, Unit Chief Mull acknowledged in her testimony that *not one* Egyptian citizen has been successfully removed to a third country pursuant to a Third Country Agreement in 2025, let alone one with Mr. Banoub's similar background—a Coptic Christian whose father fled Egypt on account of his political activism in the same country. This seemingly dramatically decreases the foreseeability of his removal to a third country.

Fourth and finally, depending on the third country to which ICE seeks to remove him, Mr. Banoub may be statutorily protected from removal under the INA or CAT. *See, e.g.*, 8 U.S.C. § 1231(b)(3) (providing that "the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group or political opinion"); *see also* 8 C.F.R. § 208.16(a) (governing withholding of removal under the INA and CAT). Respondent argues that all the process Mr. Banoub would be owed in such a circumstance is set out in the March Guidance and summarized in the eight step process discussed *supra*. (*See* ECF No. 18, at 1–2.) But district courts within the United States Court of Appeals for the Fourth Circuit and across the country have found that the process in the March Guidance is unconstitutional. *See D.V.D. v. Dep't of Homeland Sec.*, 778 F. Supp. 3d 355, 387–391 (D. Mass. 2025) (granting preliminary injunction to class of aliens because DHS' summary deportation of aliens to third countries without opportunity to raise fears of persecution violates

due process); *Cruz Medina v. Noem*, — F. Supp. 3d —, 2025 WL 2841488, at \*7–8 (D. Md. 2025) (granting preliminary injunction for petitioner by finding a due process violation under the three-factor *Mathews* framework); *Escobar v. Chestnut*, No. 1:25-cv-01801, 2025 WL 3687639, at \*2–4 (E.D. Cal. Dec. 19, 2025) ("Courts across this circuit have found that ICE's policy, as described in the March and July Memoranda, is likely unconstitutional.").

At this juncture, because Respondent has not identified a third country for removal, the Court need not and does not decide the amount and type of process to which Mr. Banoub would be constitutionally entitled if Respondent intended to remove Mr. Banoub to a country where he feared he would be persecuted or tortured. Nevertheless, that Mr. Banoub would be entitled to *some* process to adjudicate this claim depending on the third country—particularly in light of Mr. Banoub's Coptic Christian faith, which he explained in briefing would put him at risk in Libya or Sudan, (ECF No. 14, at 1–3)—weighs against a finding that removal is reasonably foreseeable. *See Zavvar*, 2025 WL 2592543, at \*8–9.

Respondent disputes that Mr. Banoub has established that his removal is not reasonably foreseeable, citing *Menghua Wan v. Crawford*, No. 1:13-cv-1473 (JCC), 2014 WL 970180, at \*4 (E.D. Va. Mar. 12, 2014). (ECF No. 10, at 10.) *Menghua Wan* is decidedly inapposite. In *Menghua Wan*, the district court found that the petitioner failed to establish that his removal was not likely to occur in the reasonably foreseeable future and denied his § 2241 petition. *Id.* at \*3–4. There, ICE secured travel documents from China, the petitioner's home country, arranged transportation for the petitioner to China, and even scheduled his departure date. *Id.* at \*2. As ICE prepared for the petitioner's removal, the petitioner sought a stay of removal from the United States Court of Appeals for the First Circuit, which ultimately remanded the petitioner's case for further consideration. *Id.* Although the petitioner was not removed on the anticipated

21

departure date, his removal was delayed only because of his pending stay of removal with the First Circuit, which the district court found did not serve as an adequate basis to claim that his removal was not reasonably foreseeable. *Id.* at *3. In explaining that the petitioner's removal was reasonably foreseeable, the district court observed that the petitioner was "slated for removal in July, and although the travel documents [ICE secured]" had expired, there was "no uncertainty about [p]etitioner's nationality" or whether China, his country of origin, "would accept him if deportation proceedings resume." *Id.* "It [was] reasonable," the court held, "to presume that [China would] issue renewed documents" upon the lifting of the stay of removal." *Id.*

Not so here. Unlike the petitioner in *Menghua Wan*, Mr. Banoub cannot be returned to his home country, and ICE has yet to locate a country willing to accept Mr. Banoub. Mr. Banoub has not contributed to any delay in removal proceedings. ICE, therefore, has not secured travel documents for Petitioner, arranged travel accommodations, or set a date for his departure. The foreseeability of Mr. Banoub's removal is far more remote than that of the petitioner in *Menghua Wan.*

Respondent next relies on a passage in *Menghua Wan* discussing various situations in which other courts determined that removal was not reasonably foreseeable. (ECF No. 10, at 13 n.3 (quoting *Menghua Wan*, 2014 WL 970180, at *4).) Respondent's reliance on the cited passage in *Menghua Wan* is misplaced. The *Menghua Wan* court observed:

> Courts have found that removal was not "reasonably foreseeable" in situations where no country would accept the detainee, the country of origin refused to issue proper travel documents, the United States and the country of origin did not have a removal agreement in place, or the country to which the deportee was going to be removed was unresponsive for a significant period of time.

*Menghua Wan*, 2014 WL 970180, at *4 (internal citation omitted).

Respondent submits that "the circumstances here are . . . in no way analogous to these

examples." (ECF No. 10, at 13 n.3.)  The Court disagrees.  The circumstances here *are*

analogous to these examples.  At present, Respondent has not identified a country willing to

accept Mr. Banoub.  Mr. Banoub cannot be returned to his home country.  And although

Respondent's inability to remove Petitioner to Egypt results from the Immigration Court's proper

withholding of removal, rather than from Egypt's refusal to provide travel documents or the lack

of a removal agreement, the fact of withholding nevertheless dramatically reduces the likelihood

of his removal.

        Having determined that Mr. Banoub has shown that his removal is not likely to occur in

the reasonably foreseeable future, the Court considers whether Respondent has rebutted

Petitioner's showing.  He has not.

### 4.    Respondent Has Not Rebutted Mr. Banoub's Showing that He is Not Likely to be Removed in the Reasonably Foreseeable Future

        Respondent has not produced evidence sufficient to rebut Mr. Banoub's showing that he

is unlikely to be removed in the reasonably foreseeable future.  *Castaneda*, 95 F.4th at 756.  In

briefing, Respondent's only argument on this point is that the "Government has rebutted [Mr.

Banoub's] showing by actively seeking travel documents and continuing to work on [Mr.

Banoub's] removal."  (ECF No. 10, at 13.)  But as the Court explained above, Respondent

cannot identify a single country that has agreed to accept Mr. Banoub, let alone started to

"actively seek" travel documents to that country.

        Moreover, Respondent's actions throughout Mr. Banoub's fourteen-month detention

hardly amount to "actively seeking" travel documents.  Respondent waited four months after Mr.

Banoub's order of removal to send I-241 requests to Mexico, Libya, and Sudan, which

Respondent then left to languish for an additional five months.  Respondent's next step in

removing Mr. Banoub did not occur until December 18, 2025—just two business days prior to

this Court's evidentiary hearing. Respondent's untimely and haphazard attempts to find a

suitable third country do not approach conduct that this Cour can deem "active efforts." To find

otherwise could incentivize a caseload-heavy immigration system to wait to initiate last-minute

action any time a court schedules review, rather than to follow a standard, consistent, and

ongoing process readily reviewable and ascertainable by the people affected.

 Finally, Respondent's I-241 requests to Mexico, Libya, and Sudan, and "nomination" of

Mr. Banoub to an unknown third country, who may or may not accept Mr. Banoub on an

unknown timeframe, do not remotely demonstrate that Mr. Banoub's removal is likely to occur

in the foreseeable future or to rebut Mr. Banoub's showing to that effect. *Cf. Cruz Medina*, 794

F. Supp. 3d at 380–81 (finding that the United States rebutted petitioner's showing that removal

was not reasonably foreseeable where the United States produced evidence that his "case [was]

under current review by El Salvador for the issuance of a travel document"). And despite

Respondent's repeated contentions that he is "continuing to work" on Mr. Banoub's removal,

Respondent has offered minimal evidence, in briefing or during the hearing, to substantiate the

nature of any continued efforts. Absent this showing, Respondent has failed to carry his burden

to rebut Mr. Banoub's showing that his removal is not likely to occur in the reasonably

foreseeable future.[16]

---

 [16] In his reply, Mr. Banoub appears to argue that ICE's 90-day and 180-day reviews were
deficient, thereby violating the INA's implementing regulations, 8 C.F.R. § 241.4, and his due
process rights. (ECF No. 12, at 2, 4–5.) Because the Court orders Mr. Banoub released under
*Zadvydas*, the Court need not and does not consider whether Mr. Banoub's rights were violated
during ICE's 90- and 180-day reviews.

 It seems, however, that were such a review to occur, Mr. Banoub might meet the
requirements that would apply during his post order custody reviews: (1) immediate removal is
not practicable; (2) he is non-violent; (3) he is likely to remain non-violent if released given his
total lack of *any* criminal history; (4) he is not likely to pose a threat to the community; and (5)
and (6) he is not likely to violate the conditions of release or flee given that he is nineteen years

### IV.  Conclusion

Recognizing the prerogative of the Executive Branch on matters involving immigration and the deference this Court owes in considering such issues, *see Zadvydas*, 533 U.S. at 700–01, Mr. Banoub has nevertheless shown that his removal is not likely to occur in the reasonably foreseeable future, and Respondent has not rebutted that presumption.

For the reasons articulated above, the Court will grant Mr. Banoub's Amended Petition and order him released.  (ECF No. 8.)

An appropriate Order shall issue.

Date: 12/23/25
Richmond, Virginia

/s/

M. Hannah Lauck
Chief United States District Judge

---

old and his closet relatives live in the United States and offer material support and employment. *See* 8 C.F.R. § 241.4(e).

Finally, because the Court grants relief under *Zadvydas*, the Court need not consider whether Mr. Banoub is entitled to additional process under the Fifth Amendment.  *See Castaneda*, 95 F.4th at 761 (explaining that the *Zadvydas* standard is due process and acknowledging that as-applied constitutional challenges remain to address "exceptional" cases).